UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| KRYSTAL G. EMANUEL and | ) | |
| NORBERTO A. EMANUEL, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.:1:19-cv-00179-WES-PAS |
| | ) | |
| U.S. BANK N.A., as Trustee for holders of | ) | |
| J.P. Morgan Mortgage Acquisition Trust | ) | |
| 2006-CH2 Asset-Backed Pass-Through | ) | |
| Certificates, Series 2006-CH2, and | ) | |
| SELECT PORTFOLIO SERVICING, INC., | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT

### I.  INTRODUCTION

Plaintiffs Krystal and Norberto Emanuel ("Emanuel") cannot avoid their obligations under a mortgage loan and prevent a foreclosure sale of the property located at 76 Adelaide Avenue, Providence (the "Property").  All claims brought in the Complaint for Injunctive and Other Relief to contest foreclosure fail as a matter of law.  Emanuel also fails to state a claim for an order declaring rights to insurance checks against Defendants Select Portfolio Servicing, Inc. ("SPS") and U.S. Bank N.A., as Trustee (the "Trustee").  Emanuel's complaint must be dismissed with prejudice.

### II.  FACTUAL ALLEGATIONS AND BACKGROUND

On March 10, 2006, Emanuel executed a promissory note (the "Note") in the original principal amount of $318,750 secured by a mortgage (the "Mortgage") on the Property. (Complaint, ¶¶ 4, 5; Mortgage, attached hereto at **Exhibit A**).

Count I of the Complaint asserts a violation of the Real Estate Settlement Procedures Act ("RESPA") citing 12 U.S.C. § 2605(e).  (Complaint, ¶ 7).  Emanuel contends, "Plaintiffs,

through Cherry Tree Institute as their representative, have requested verification of the validity of the mortgage under which Defendants have based their foreclosure proceeding pursuant to 12 U.S.C. § 2605(e)(1)(A), as set forth in Exhibits A-1 and A-2, but the servicer's responses have been completely inadequate." (Complaint, ¶ 7).  Emanuel further states a need for "verification" so that the "balance of the mortgage loan can be ascertained and modified, refinanced, or paid off." (Complaint, ¶ 9).  Count I and Count II seeks to enjoin the foreclosure sale that was scheduled for April 4, 2019.  The auction was cancelled upon the issuance of the temporary restraining order by the Providence County Superior Court on April 3, 2019.

In addition, Count III of the Complaint alleges that the Property "has been damages by natural causes during 2017 and 2018 and the homeowners' insurer has issued two checks to cover the damages and necessary repairs."  Emanuel claims that "the checks are payable to the Plaintiffs and Defendant 'JP Morgan Chase Bank ISAOA' as joint payees" and the "the Defendant has refused to execute the checks so as to allow repairs to be completed and reimbursement to the Plaintiffs for repairs already done." (Complaint, ¶¶ 14-16).  Emanuel seeks the Court "to issue an Order requiring the Defendants to execute the insurance checks and allow the Plaintiffs to retain the funds [.]"

### III.  LAW AND ARGUMENT

A.    Emanuel Fails to State a Claim Under RESPA

Emanuel's RESPA claim is facially grounded in the alleged violation of the Qualified Written Response ("QWR") provisions.  Count I cites to 12 U.S.C. § 2605(e), and generically concludes "no adequate remedy at law to protect their home" exists as a result of the foreclosure. (Complaint, ¶ 7).  Assuming arguendo that the letters from Cherry Tree Institute constitute "qualified written requests" under the stringent statutory definition, see, e.g., Lebeau v. U.S.

<u>Bank, N.A. as Trustee for Citigroup Mortgage Loan Trust Inc.</u>, CA No. 17-329-JJM-PAS, 2019 WL 1077285, at * 3 (D.R.I. March 7, 2019), Emanuel's RESPA claims fail.

No RESPA claim based on a QWR violation lies against the Trustee as the foreclosing mortgagee. The QWR provisions only apply to loan servicers. <u>See</u> 12 U.S.C. § 2605; <u>Lebeau</u>, at * 3 (citing statute) ("To state a claim for a violation of RESPA, a plaintiff must allege facts to support that: (1) the defendant is a loan servicer, (2) the plaintiff sent the defendant a valid QWR, (3) the defendant failed to respond adequately within the statutory period, and (4) the plaintiff is entitled to actual or statutory damages."). Thus, any RESPA claim against the Trustee must be summarily dismissed.

Also, RESPA does not permit equitable relief. Congress expressly limited individual recovery under RESPA to actual damages and costs. <u>See</u> 12 U.S.C. § 2605(f). In fact, RESPA expressly states, "Nothing in this chapter shall affect the validity or enforceability of . . . any loan, loan agreement, mortgage, or lien made or arising in connection with a federally related mortgage loan." 12 U.S.C. § 2615. Accordingly, an essential element of a RESPA action is actual pecuniary loss. <u>See</u> <u>Jones v. Bank of New York</u>, 2013 WL 3728382, at * 4 (D. Mass. July 12, 2013) ("Nonetheless, Jones cannot recover on this [RESPA] count because he fails to plead any actual damages from BANA's failure to respond.") (citations omitted); <u>Okoye v. Bank of New York Mellon</u>, 2011 WL 3269686, at *17 (D.Mass. July 28, 2011) (citations omitted); <u>Avedisian v. Select Portfolio Servicing, Inc.</u>, No. 16-654S, 2017 WL 6334123, at *6 (D.R.I. Aug. 29, 2017), adopted, 2017 WL 6343644 (D.R.I. Dec. 11, 2017). The Complaint only seeks

injunctive relief, and Emanuel does not specify any alleged monetary loss caused by the claimed RESPA violation.  Thus, Count I and Count II must be dismissed.[1]

Although not pleaded on the face of the Complaint, Emanuel appears also to press a violation of the loss mitigation regulations applicable to loan servicers under Regulation X at 12 C.F.R. § 1024 promulgated under RESPA.  See also Avedisian, at *6.  Again, these regulatory standards do not apply to the Trustee.  Even so, the loss mitigation regulations do not mandate relief: "Nothing in § 1024.41 imposes a duty on a servicer to provide any borrower with any specific loss mitigation option."  Emanuel's mere hope for loss mitigation does not state a cause of action.  See Nash v. GMAC Mortgage, LLC, 2011 WL 2470645, at *10 (D.R.I. May 18, 2011) (citations omitted) (rejecting various claims based upon failure or refusal to modify a loan); see also Avedisian, at * 8 ("[t]he dashing of a mortgagor's hopes or expectations of good faith in regards to a short sale … does not support a viable cause of action. . . [.]").  Emanuel does not identify any conduct giving rise to an actionable loss mitigation claim.  See Lebeau, at * 3.  Further, whereas § 1024.41 is enforced under § 2605 of RESPA, the failure by Emanuel to allege quantifiable harm defeats the action.  See also Avedisian, at * 6.

B.    Emanuel Fails to State a Claim to Contest the Trustee's Foreclosure Rights

Emanuel's generalized dispute concerning a purported lack of "clear and convincing evidence" of the Trustee's "capacity" as "legal holder of the Note" entitled to foreclose the

---

[1] Emanuel's generic demand for costs and attorney's fees does not meet the pleading standards of actual monetary loss caused by the RESPA violation.  Further, it is well-established that attorney's fees for bringing a RESPA suit are not actual damages under the statute.  Long v. Deutsche Bank Nat. Trust Co., No. 10–00359 JMS/KSC, 2011 WL 5079586, at *4 (D.Haw. October 24, 2011); Kevelighan v. Trott & Trott, P.C., No. 09–12543, 2011 WL 2076336, at *4 (E.D.Mich.2011 May 26, 2011); Lal v. Am. Home Servicing, Inc., 680 F.Supp.2d 1218, 1223 (E.D.Cal.2010); Luciw v. Bank of Am., N.A., No. 5:10–cv–02779–JF/HRL, 2010 WL 3958715, at *5 (N.D.Cal. Oct.7, 2010); Allen v. United Fin. Mortg. Corp., 660 F.Supp.2d 1089, 1097 (N.D.Cal.2009).

Mortgage (Complaint, ¶ 8) is irrelevant and legally inconsequential.  As this Court has expressly held, "According to settled Rhode Island law, U.S. Bank's status as the assignee of the Mortgage gives it the right to enforce the Mortgage as the security for Plaintiffs' obligations under the Note.  It does not need also to be the holder of the Note."  Avedisian, at * 5 (citing Bucci v. Lehman Brothers Bank, FSB, 68 A.3d 1069, 1087-89 (R.I. 2013) and Culhane v. Aurora Loan Servs. of Neb., 708 F.3d 282, 292 (1st Cir. 2013)); see also Pimentel v. Deutsche Bank National Trust Co, 174 A.3d 740, 745 (RI 2017) ("[U]nder Rhode Island case law, a mortgagee may foreclose even if it does not hold the note.").

C.      The Count for Injunctive Relief Must Be Stricken

Apart from being moot, Count II for an order to enjoin the foreclosure sale originally scheduled for April 4, 2019 does not state an affirmative claim for recovery.  "[A] claim for injunctive relief is not a standalone cause of action."  Doe v. Brown University, 2016 WL 715794, at * 16 (D.R.I. Feb. 22, 2016) (citations omitted).  Accord Payton Wells Fargo Bank, N.A., 2013 WL 782601, at *6 (D.Mass. Feb. 28, 2013).

D.      Emanuel Fails to State a Claim for a Declaration of Alleged Rights To Insurance Proceeds Checks

In the first instance, the Complaint is devoid of any factual basis underlying Emanuel's purported legal rights to payment of casualty insurance proceeds.  Emanuel vaguely references damage to the Property in 2017 and 2018, repairs, and insurance checks.  Emanuel does not allege why payment of the proceeds is legally owed, or any facts to trigger a legal claim to force SPS or the Trustee to endorse the checks via a judicial order.  Further complicating the convoluted and contradictory pleading, Emanuel alleges that the checks were issued and "payable to the Plaintiffs and Defendant 'JP Morgan Chase Bank ISAOA' as joint payees."  Yet, JP Morgan Chase Bank is not a named defendant to this action.

Notwithstanding these defects, Emanuel is not legally entitled to a declaration of rights concerning to the endorsement of insurance checks arising in 2017 and 2018. An advisory opinion on the legality of past conduct is not available under declaratory judgment jurisdiction. Rather, declaratory relief addresses future legal rights to assist parties in "conform[ing] their conduct to avoid future litigation." Wilborn v. Wall, No. 13-cv-11783-GAO, 2015 WL 5662717, at *6 (D. Mass. Sept. 25, 2015) (citing Aldrich v. Young, No. 13-cv-10466-DPW, 2013 WL 3802436, at *9 (D. Mass. July 18, 2013)). Declaratory judgments are not available "simply to proclaim liability for a past act." Brown v. Rhode Island, 511 Fed.Appx. 4, 6 (1st Cir.2013) (quoting Ysais v. New Mexico, 373 Fed.Appx. 863, 866 (10th Cir.2010)) (internal quotation mark omitted). Declaratory relief is "untimely if the questionable conduct has already occurred or damages have already accrued." Aldrich, 2013 WL 3802436, at *9. See also ACLU of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 53 (1st Cir.2013) (quoting Spencer v. Kemna, 523 U.S. 1, 18 (1998) ("federal courts are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong.")). This required case-or-controversy element "must be satisfied at each and every stage of the litigation." Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir.2001).

Here, putting aside the dearth of factual allegations, Count III centers on alleged prior conduct with respect to insurance checks. Indeed, Emanuel's claim of a prior injury suffered and the request for this Court to declare the extent of the injury spotlights the legal futility of the declaratory judgment count. Count III must be dismissed as a matter of law.

In addition, the Complaint seeks relief in the nature of an accounting of monies paid under an insurance policy. An accounting is a remedy available for a breach of fiduciary duty, but does not provide affirmative relief as a free-standing cause of action. See Greene v. Ablon,

No. 09-10937-DJC, 2013 WL 4714344, at *6, n. 6 (D. Mass. Aug. 28, 2013), aff'd in part, 794 F.3d 133 (1st Cir.2015) (citing Dairy Queen, Inc. v. Wood, 369 U.S. 469, 478 (1962). The Complaint correctly does not include an affirmative claim for breach of fiduciary duty, because the typical lender-borrower relationship does not give rise to a fiduciary relationship. See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 102 (1st Cir.2009) ("[T]he relationship between a lender and a borrower, without more, does not establish a fiduciary relationship.") (applying Massachusetts law); Fleet Nat'l Bank v. Liuzzo, 766 F.Supp 61, 68–69 (D.R.I. 1991). Thus, declaratory relief sought to force a judicial accounting fails as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Defendants Select Portfolio Servicing, Inc. and U.S. Bank N.A., as Trustee, request this Court to dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

**SELECT PORTFOLIO SERVICING, INC. AND U.S. BANK, N.A., AS TRUSTEE,**

By their attorneys,

/s/ Peter F. Carr, II
Peter F. Carr, II (R.I. Bar #5343)
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Two International Place, 16th Floor
Boston, MA 02110-2602
Telephone: 617.342.6800
Facsimile: 617.342.6899
pcarr@eckertseamans.com

Dated: April 15, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date the foregoing document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those parties which are as non-registered participants as well as to counsel of record in the state court proceedings:

Michael J Furtado (#4614)
1319 Cranston Street, Cranston, RI 02920-6719
(401) 943-1732
furtadolaw@gmail.com


/s/ Peter F. Carr, II
Peter F. Carr, II

Dated:  April 15, 2019

# EXHIBIT A

Doc No: 00129684
Book: 7916   Page:   73

Return To:
Chase USA c/o CHF, LLC

Att: Document Control, Dept. 400
10790 Rancho Bernardo Rd.
San Diego, CA 92127.

Prepared By:
Cortes, Diana



—————————————[Space Above This Line For Recording Data]—————————————

## MORTGAGE

2261012-5

/691

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 10, 2006
together with all Riders to this document.
(B) "Borrower" is KRYSTAL G EMANUEL and NORBERTO A EMANUEL

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is Chase Bank USA, N.A.

Lender is a National Association
organized and existing under the laws of United States

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3040  1/01  (rev. 11/02)

-6 (RI) (0208)

Page 1 of 15          Initials _____

VMP MORTGAGE FORMS - (800)521-7291

Doc No: 00129684
Book: 7916  Page:   74

Lender's address is 200 White Clay Center Drive
Newark, DE  19711
Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated March 10, 2006
The Note states that Borrower owes Lender Three Hundred Eighteen Thousand
Seven Hundred Fifty and 00/100ths                                           Dollars
(U.S. $ 318,750.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than April 01, 2036
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] Adjustable Rate Balloon Rider |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

*MNE  K.C.E.*

Doc No: 00129684
Book: 7916   Page: 75

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the following described property located in the COUNTY                    [Type of Recording Jurisdiction]
of  Providence                                         [Name of Recording Jurisdiction]
See Attached Schedule A

Parcel ID Number:                                     which currently has the address of
76 ADELAIDE AVE                                                              [Street]
Providence                            [City], Rhode Island 02907-0000  [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

▬▬▬▬▬

Initials _____

-6(RI) (0208)              Page 3 of 15              Form 3040  1/01  (rev. 11/02)

Doc No: 00129684
Book: 7916   Page:   76

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Doc No: 00129684
Book: 7916   Page:   77

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

*W.E. K.G.E.*

Doc No: 00129684
Book: 7916    Page: 78

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

*M. E. K. C. E.*

Doc No: 00129684
Book: 7916    Page: 79

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Doc No: 00129684
Book: 7916  Page:  84

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Doc No: 00127684
Book: 7916  Page: 81

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Doc. No: 00129684
Book: 7916   Page: 82

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials _____

-6(RI) (0208)                    Page 10 of 15                    Form 3040  1/01  (rev. 11/02)

*Nli. E.  K.C.E.*

Doc No: 00129684
Book: 7916  Page: 83

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

-6(RI) (0208)                    Page 11 of 15                    Initials _____    Form 3040 1/01 (rev. 11/02)

Doc No: 00129684
Book: 7916  Page: 84

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6 (RI) (0208)                     Page 12 of 15          Initials _____        Form 3040  1/01  (rev. 11/02)

Doc No: 001229684
Book: 7916   Page:   85

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Outstanding Automatic Orders in Domestic Relations Cases.** Borrower hereby represents and warrants to Lender that either (a) there is no outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against any Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation or (b) there is an outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against a Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation, and the other party that is subject to such order has consented to, or the court which issued the automatic order has issued another order authorizing, such Borrower's execution of the Note and this Security Instrument.

**25. Homestead Estate.** If Borrower heretofore has acquired or hereafter acquires an estate of homestead in the Property, Borrower hereby agrees that such homestead estate is waived to the extent of this Security Instrument and the amount due under the Note and to the extent of all renewals, extensions and modifications of this Security Instrument or the Note, and that said homestead estate is subject to all of the rights of Lender under this Security Instrument and the Note and all renewals, extensions and modifications of this Security Instrument and the Note, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Furthermore, Borrower hereby waives the benefits of any homestead or similar laws or regulations that may otherwise be applicable from time to time.

Doc No: 00129684
Book: 7916  Page:    86

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                            NORBERTO A EMANUEL              -Borrower

_____    _____ (Seal)
                            KRYSTAL G EMANUEL               -Borrower

_____ (Seal)    _____ (Seal)
                 -Borrower                                  -Borrower

_____ (Seal)    _____ (Seal)
                 -Borrower                                  -Borrower

_____ (Seal)    _____ (Seal)
                 -Borrower                                  -Borrower

-6(RI) (0208)              Page 14 of 15          Form 3040  1/01  (rev. 11/02)

```
Doc No: 00129684
Book: 7916  Page:    87
```

STATE OF RHODE ISLAND,          *Providence* County ss:

On this 10th       day of March, 2006           , in *Providence*          ,
in said County, before me personally appeared   NORBERTO A EMANUEL and KRYSTAL G
EMANUEL

each and all to me known and known to me to be the person(s) executing the foregoing instrument and
acknowledged said execution to be his/her/their free act and deed.

_____
Notary Public *George J. Cough, ett.*
        *mc 8 9/27/08*

-6(RI) (0208)        Page 15 of 15          Form 3040  1/01  (rev. 11/02)

Doc No: 00129684
Book: 7916   Page:   88

EXHIBIT "A"

That certain lot or parcel of land, with all the buildings and improvements thereon situated at the southeasterly corner of Adelaide Avenue and Niagara Street in the City of Providence, County of Providence, State of Rhode Island, bounded and described as follows:

Beginning at said corner; thence easterly, bounding northerly on said Adelaide Avenue seventy (70) feet; thence southerly on a line parallel to said Niagara Street and bounding easterly on land now or lately of Ida S. Wagner, one hundred (100) feet, thence westerly in a line parallel with said Adelaide Avenue and bounding southerly on land now or lately of Jessie M. MacFadyn et al in part and in part on land now or lately of Lawrence E. Morra, Jr., seventy (70) feet to said Niagara Street, thence northerly, bounding westerly on said Niagara Street, one hundred (100) feet to the point and place of beginning.

Without being a part of the description of the premises herein conveyed, and for reference purposes only, Being Lot No. 144 on City of Providence Tax Assessor Plat No. 53 as presently constituted.

Meaning and intending to convey the same premises as conveyed to Krystal G. Emanuel by deed of J.E. Newman II and Shirley Newman dated July 15, 1998 and recorded in the Providence Records of Land Evidence in Book 3848 at Page 322.

Property Address:
76 Adelaide Avenue
Providence, RI
Assessor's Plat 53, Lot 144

Doc No: 00129684
Book: 7916 Page: 89

Loan # ▮▮▮▮▮▮▮

# 1-4 FAMILY RIDER
## Assignment of Rents

THIS 1-4 FAMILY RIDER is made this 10th     day of  **March, 2006**
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or
Security Deed  (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to  **Chase Bank USA, N.A.**

(the "Lender") of the same date and covering the property described in the Security Instrument and
located at: **76 ADELAIDE AVE**
**Providence, RI 02907-0000**

Property Address

**1-4 FAMILY COVENANTS.**  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.**  In addition to the
property described in the Security Instrument, the following items now or hereafter attached to the
property to the extent they are fixtures are added to the property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling,
electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access
control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators,
dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades,
curtains and curtain rods, attached mirrors, cabinets, panelling and attached floor coverings now or
hereafter attached to the Property, all of which, including replacements and additions thereto, shall be
deemed to be and remain a part of the Property covered by this Security Instrument. All of the foregoing

MULTISTATE 1-4 FAMILY RIDER
C-6015 (2/05) Page 1 of 4 (Replaces 2/00)                                                  Form 3170 3/99

K.G.Ee.

Doc No: 00129684
Book: 7916  Page:    90

together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Uniform Covenant 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Uniform Covenant 19 is deleted.

**F. BORROWER'S OCCUPANCY.** With regard to non-owner occupied investment properties, the first sentence in Uniform Covenant 6 concerning Borrower's occupancy of the Property is deleted. For all properties, all remaining covenants and agreements set forth in Uniform Covenant 6 shall remain in effect.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request, after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this Paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower

MULTISTATE 1-4 FAMILY RIDER
C-6015 (2/05) Page 2 of 4 (Replaces 2/00)

Form 3170 3/99

K·G·E·

Doc No: 00129684
Book: 7916   Page:    91

authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Paragraph 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent.  This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

    If Lender gives notice of breach to Borrower:  (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

    If the Rents of the Property are not sufficient to cover the cost of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Uniform Covenant 9.

    Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

    Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs.  Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

MULTISTATE 1-4 FAMILY RIDER
C-6015 (2/05)  Page 3 of 4 (Replaces 2/00)                                                                    Form 3170 3/99

*K.G.E.*

*[signature]*

Doc No: 00129684
Book: 7916    Page:    92

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

| | | |
|---|---|---|
| Borrower **NORBERTO A EMANUEL** | Date | Borrower **KRYSTAL G EMANUEL** | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

MULTISTATE 1-4 FAMILY RIDER
C-6015 (2/05)  Page 4 of 4 (Replaces 2/00)                    Form 3170 3/99

Doc No: 00129684
Book: 7916    Page: 93

## ADJUSTABLE RATE BALLOON RIDER
### (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 10th day of **March, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Chase Bank USA, N.A.**

(the "Lender")

a **National Association** organized and existing under the laws of **United States** of the same date and covering the property described in the Security Instrument and located at:
**76 ADELAIDE AVE**
**Providence, RI 02907-0000**

(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**THIS LOAN IS PAYABLE IN FULL AT THE END OF THIRTY (30) YEARS. THE BORROWER MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. THE BORROWER WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT THE BORROWER MAY OWN, OR THE BORROWER WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER THE BORROWER HAS THIS LOAN WITH, WILLING TO LEND THE BORROWER THE MONEY. IF THE BORROWER REFINANCES THIS LOAN AT MATURITY, THE BORROWER MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF THE BORROWER OBTAINS REFINANCING FROM THE SAME LENDER.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of **Eight and 900/1000**
**8.900** %.

MULTISTATE LIBOR ARM/BALLOON RIDER
BC-6789 (10/05) Page 1 of 3

K.G.E.    M.E.

Doc No: 00129684
Book: 7916   Page:   94

The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)  Change Dates**

The interest rate I will pay may change on the 1st     day of **April, 2009**                              ,
and on that day every sixth month thereafter. Each date on which my interest rate could change is called "Change Date".

**(B)  The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Four and 650/1000**
percentage points (**4.650**                  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal over what remains of the original forty (40)-year amortization term at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of the monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.900**                                                                                                                    %
or less than  **8.900**
                                                                                                                             %.
Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and a half percentage points (1.5%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than
**15.900**
                                                                                                                             %
and will never be lower than  **8.900**                                                                            %.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment after the Change Date until the amount of my monthly payment changes again.

MULTISTATE LIBOR ARM/BALLOON RIDER
BC-6789  (10/05)  Page 2 of 3

*K.C.E.   M.E.*

Doc No: 00129684
Book: 7916   Page:   95

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G)   Final Balloon Payment**

The Balloon Payment, in the amount of the remaining balance of the principal sum, interest, and any other amounts payable under this Note, will be due and payable on the Maturity Date. The Note Holder will deliver or mail to me a notice of the amount of the Balloon Payment before the Balloon Payment becomes due. This notice about the Balloon Payment will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

| | | | |
|---|---|---|---|
| Borrower **NORBERTO A EMANUEL** | Date | Borrower **KRYSTAL G EMANUEL** | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

MULTISTATE LIBOR ARM/BALLOON RIDER
BC-6789  (10/05)  Page 3 of 3

RECEIVED:

Providence
Received for Record
Mar 13, 2006  at  10:02:57A
Document Num:   00129684
Barbara Troncy
Recorder of Deeds